# AFFIDAVIT OF DR. IRINA N. BELOOZEROVA

STATE OF ARIZONA         )
                                 )    ss.

COUNTY OF MARICOPA    )

I, Dr. Irina N. Beloozerova, being first duly sworn, hereby deposes and says as follows:
I make this affidavit upon my personal knowledge of the facts set forth below.

1.  I am over the age of 18 and am competent to make this Affidavit.

2.  I am an employee of Dignity Health and my work involves conducting scientific studies, primarily on the effects of strokes, at the Barrow Neurological Institute ("Barrow").

3.  I am a Russian born, naturalized United States citizen, and earned my PhD in biology from Lomonosov University in Moscow, Russia in 1989.  I am 59 years of age. In my area of scientific discipline I am a leading brain physiologist and scientist.  I have worked in important scientific capacities such as the Soviet Space program, and thereafter conducted postdoctoral neuroscience research at leading universities throughout the world. I am a internationally recognized scientist who conducts groundbreaking research, primarily on the effects of strokes.

4.  In May, 2000, I was hired by Barrow as an assistant staff scientist in the division of neurobiology.

5.  In 2008, as a result my nationally recognized excellence in the area of neuroscience research, as well as the merit and value I brought to Barrow, I was appointed and promoted to an Associate Professor faculty position with "standing".  An appointment or promotion to a "standing" position at Barrow is similar to an academic tenured position insomuch as it grants, to those professors

with standing designations, certain employment contract rights as well as limiting
the circumstances under which Barrow may terminate my employment.

6. Barrow communicates the conditions and policies concerning its employment
rights for members of the standing faculty, such as associate professors with
standing like myself, in a 23-page document titled *Barrow Neurological Institute
Appointments and Promotions Policy*. I acknowledge receipt of and reliance on
the Barrow Policy.

7. The Barrow Policy unequivocally expresses to me Barrow's intent that it is a
contract of employment which expressly restricts the right of Barrow to terminate
those who are appointed and/or promoted to the level of associate professors with
standing and of full professors with standing. For example, the Barrow Policy
states, in relevant part: **a.)** "*Continuing appointment of any BNI faculty member is
contingent on satisfactory performance of duties and on availability of fund to
support the position.*" (Section 3, pg. 7); **b.)** "*Associate Professors in the
Clinician-Scientist track will also have engaged in clinical trials and/or
laboratory-based investigations that have become an extramurally-funded
program of independent and original research.*" (Section 4, pg. 9); **c.)** "However,
once an individual has been promoted to Associate or Full Professor …
**appointments are considered to be "standing," meaning that terms of the
contract shall be renewed annually except under circumstances as defined
below (i.e. until retirement, resignation, reinstatement of probationary status,
or dismissal with cause).**" (emphasis added) (Section 6, pg. 13); **d.)**
"Notwithstanding the process for addressing faculty with standing appointments
who fail to meet performance, grounds for immediate dismissal with cause, even
for individuals holding standing appointments, will be substantive and manifest
professional incompetence, malfeasance, gross neglect of or substantial incapacity

to perform properly assigned duties, serious professional and ethical misconduct, and/or felonious actions." (Section 6, pg. 15);

8.  A separate section of the Barrow Policy explains the two (2) grounds under which individuals holding standing appointments may be dismissed. The first is "for cause", and the second is for those who have positions to be terminated due to a.) financial emergencies, b.) reorganizations or c.) the elimination of programs. (Section 9, page 22).

9.  As it pertains to Professors with standing, whether they be Associate Professors or Full Professors, the Barrow Policy is devoid of any disclaimer language stating that it does not constitute a contract of employment, and is further devoid of any language that says that my employment is at-will. Therefore, an employment contract was entered into between Barrow and myself.

10. To the best of my recollection, since at least 2004, Barrow has had in place a policy manual containing similar employment rights and protections for Associate Professors with standing or Full Professors as those expressed in the current Barrow Policy.

11. My employment performance at Barrow has always been very good and I have never been written up for any disciplinary concerns. My last employment performance evaluation occurred in 2017 for the annual period ending June 30, 2017, and my manager Dr. Robert Bowser gave me an overall rating of "Meets Expectations (Strong Performance)".

12. It is regarded as common knowledge amongst the Barrow personnel that once appointed or promoted to the level of Associate Professor with standing or Full Professor with standing, that said appointment (*i.e.* employment) will continue provided the individual's job performance is a.) satisfactory and b.) that they obtain sufficient external/extramural funding to cover half of their salaries and fringe benefits plus their full laboratory costs. This was my belief as well. In an

August 17, 2017 letter I received that was authored by the three executives who collectively run Barrow, Chairman of Neurobiology Robert Bowser, Vice-President Ronald Lukas and Chief Operating Officer Tom Bour, it stated: **"As you know, appointments in the laboratory research at St. Joseph's Hospital and Medical Center (SJHMC) and its Barrow neurological Institute (BNI) also are contingent on <u>the availability of funds to support the position and on job performance criteria</u>."** (emphasis underlined).

13. Even if sufficient external/extramural funding is not obtained by Associate Professors or Full Professors, Barrow customarily and regularly allows these professors to continue working for numerous years through an internal bridge funding program called gap funding ("Gap Funding"). The purpose of the Gap Funding program is to provide funds to professors with standing so they may continue their research programs and consequently continue their employment at Barrow. The Gap Funding program helps alleviate periods when professors (with standing) find themselves without sufficient external funding. Although Barrow does not guarantee that an individual will receive Gap Funding indefinitely, once it is awarded to a professor with standing, Barrow does not request a return of those funds. The receipt of numerous years of Gap Funding is not a basis for termination of employment with Barrow.

14. Barrow's fiscal year is from July 1st through June 30th of the following year. When Barrow grants Gap Funding, it occurs on a fiscal year basis. In my case, I was granted Gap Funding for the fiscal year commencing July 1, 2017 through June 30, 2018. When Barrow grants Gap Funding, the funds for that fiscal year are deposited into a "gap funding activity account" that is associated with the scientist/professor. The scientist/professor is then free to draw on his/her gap funds during the entire fiscal year to run their laboratory and pay for their research. If the funds received through the Gap Funding program are not completely

exhausted by the scientist/professor at the end of the fiscal year, those funds are credited to the next fiscal year upon the researcher's request, and this is referred to as a *carry forward* or *carry forward of gap funds*. Thus, the phrase *carry forward* or *carry forward of gap funds* refers to carrying forward gap funds into the next fiscal year (from the previous fiscal year).

15. Presently at Barrow there are several Professors with standing who lack the contractual amount of external/extramural funding, who nevertheless are allowed to continue their employment with Barrow, and are receiving Gap Funding.

16. An August 17, 2017 letter from my supervisors informed me that my employment would end at Barrow, ostensibly due to a lack of obtaining adequate external funding. In relevant part the August 17, 2017 letter states, "**In accordance with the appointments and promotions and with gap funding policies, and after much deliberation, this letter shall serve as notice that your employment as an Associate Professor in the Division of Neurobiology will end once funds on hand to support your full-time employment have been exhausted (the "Separation Date") which is projected to be no later than July 1, 2018.**" This letter clearly explains that a lack of sufficient external funding was the sole basis for my termination, and that my termination is timed to coincide the with the depletion of certain "funds on hand".

17. The "funds on hand" referenced in the August 17, 2017 letter referred to funds awarded to me under the Gap Funding program for the fiscal year 2017-2018 plus the carry forward (of unspent gap funds) from the prior fiscal year, 2016-2017.

18. Obtaining funding for science research programs such as those that I conduct is extremely competitive. Grant sources and other external funding sources look carefully at the size and equipment of the laboratory facilities the researcher can provide, the status and reputation of the researcher seeking the grant and the amount of the applicant's institutional support for research. These grant sources

require researchers like myself to build on past and current research and further show progress when determining whether to renew any such funds. Institutional support is critical and is one of five (5) evaluation criteria along with the applicant's qualifications, significance of science study, technical soundness and the potential impact of the anticipated research. A significant detriment to being awarded a research grant is when a scientist or applicant is not currently employed at a research facility. Closing a researcher's laboratory, as Barrow seeks to do by terminating me, impairs, harms and will continue to impair and harm my ability to obtain additional funding and support from other sources, which are necessary for me to continue my significant and important ongoing research. I have been one of Barrow's top recipients of national research grants as measured in gross dollars.

19. Two of the largest grant funding sources in the United States are the National Science Foundation ("NSF") and the National Institute of Health ("NIH"). I have now received grants from both of these organizations. In December, 2017, I learned that I would receive a three (3) year award grant from the NSF in the amount of $150,000 *annually* for the years 2018 through 2020, provided that I returned a few perfunctory documents to the NSF, which I promptly did. This $150,000 annual NSF award grant (hereinafter, "NSF Award") was more than sufficient to cover my external/extramural funding requirement for continued employment since I only needed to obtain no more than $140,000 annually. Barrow communicates to each professor the amount of annual external funding that each must obtain. Based on the annual amount of the NSF Award, I met my contractual obligation to have adequate external funding to maintain my employment through at least June 30, *2019*.

20. By obtaining at least $140,000 in external funds, I would meet my contractually required amount to cover half of my salary and fringe benefits and the full cost of my laboratory expenses and thus would be entitled to continued employment.

21. All funds, which include external ones such as the NSF Award as well as internal ones, such as gap funds, are maintained and tracked in accounts associated with each individual scientist/professor at Barrow. Gap funds and carry forward funds are maintained in accounts titled "Gap Funding Activity Accounts". Grant funds are maintained in separate accounts. The amount of the funds in each of these accounts are easily verifiable, and my supervisors have the authority to check those accounts and their respective balances.

22. In December of 2017, I informed my supervisors, Vice President Dr. Ron Lukas (hereinafter, "**Dr. Lukas**") as well as the Chairman of the Neurobiology Department, Dr. Robert Bowser (hereinafter, "**Dr. Bowser**") of the NSF Award. Both congratulated me on the obtaining the award and Dr. Lukas told me that I now had sufficient funds for continued employment past June 30, 2018.

23. On December 18, 2017 Dr. Lukas emailed me to congratulate me on the NSF Award and confirmed that I had enough funding to carry me through the 2018 calendar year. The email also referenced both a *carry forward* balance and *"the remaining gap funding (which we are prepared to provide because the NSF award does not completely make up for the funds lost in the NIH grant) you indeed have* enough funding to carry you through the 2018 calendar year". Dr. Lukas' "carry forward" statement referenced unused gap funds from the prior fiscal year (2016-2017) that were designated for me, and his "gap funding" remark referenced the gap funds that were awarded and available to me for the current fiscal year, *i.e.* July 1, 2017 through June 30, 2018. Finally, Lukas' statement that the NSF award "...*does not completely make up for the funds lost in the NIH grant*" was a reference to the fact that the NSF Award was less than my previous grant from the NIH (for the years 2007 through 2014). Although Lukas' statement that the NSF Award was less than the prior NIH award, this fact was irrelevant since I now had sufficient funds to satisfy my external funding requirement necessary for

employment through at least June 30, 2019. As it turned out, the $150,000 NSF Award made it unnecessary for me to make use of any of the gap funds in my research account *if I so chose*. Dr. Lukas' assurance to me that I now had sufficient funding for employment — at least through end of the 2018 calendar year — was significant and authoritative since he was responsible for developing and setting the budget for professors in the neurobiology department.

24. Although the $150,000 NSF Award made it unnecessary for me to utilize the gap funds and carry forward funds which were already in my Gap Fund Activity account (which I could use at my discretion), the practice by my colleague professors at Barrow who have such funds is to utilize them whether they have obtained other external funds or not. When a professor at Barrow secures external funding while they have available gap funds in their account, as in my case, the practice is to first exhaust our gap funds, and then utilize our external funds. If a professor has sufficient gap funds in their account for use in the current fiscal year and also secures external funding during the same fiscal year, like I did with my NSF Award, the professor is allowed to designate the use of the external funds to the following fiscal year. Because I had sufficient gap funds to see me through June 30, 2018, when I received my NSF Award, I chose to designate the $150,000 award toward the following fiscal year — July 1, 2018 through June 30, 2019. This $150,000 NSF Award met the external funding requirement within the Barrow Policy to guarantee my employment through at lease June 30, 2019.

25. Gap Funding Activity account statements are generated monthly and include not only the amount of funds in the account, but the amount utilized per month, which is referred to as the "burn rate". The monthly Gap Funding Activity account also has an entry that estimates the amount of months left at the "burn rate" ratio for that month. Attached as Exhibit C is the my Gap Funding Activity account statement for January, 2018 (**"January, 2018 Statement"**). Both the burn rate and

amount of months left at the burn rate ratio for that month appear at the bottom right of that statement. The January 2018 Statement indicates that I had an estimated 16.96 months of gap funds left at the indicated burn rate of $6867.01 per month. Attached as Exhibit D is my Gap Funding Activity account statement for February, 2018 (**"February, 2018 Statement"**), and it reveals that I had an estimated 13.89 months of gap funds left at the indicated burn rate of $7515.58 per month. Finally, attached as Exhibit E is my Gap Funding Activity account statement for March, 2018 (**"March, 2018 Statement"**), and it reveals that I had an estimated 12.08 months of gap funds left at the indicated burn rate of $7803.50 per month. All three of these Gap Funding Activity account statements clearly establish two (2) things: first, that I had more than sufficient gap funds for the fiscal year ending June 30, 2018, and second, that my $150,000 NSF Award would not need to be utilized until the following fiscal year (fiscal year July 1, 2018 through June 30, 2019). Lastly, even at the highest burn rate indicated in Exhibits C, D and E — $7803.50 (February, 2018 statement), my $150,000 NSF Award could was more than sufficient to fund the following fiscal year.

26. The $150,000 NSF Award was received by Barrow on January 17, 2018, and on that day Barrow's Grants Operations Manager Ms. Sherri Howland emailed me to congratulate me on the receipt of the funds. See Exhibits F & G respectively. The award exceeded the amount of external funds I needed for continued employment, at least through June 30, 2019. On January 23, 2018, I met with Drs. Bowser and Lukas to discuss my future at Barrow in light of the fact that I obtained sufficient funding for continued employment. At this meeting Dr. Lukas acknowledged that, although my NSF Award was indeed sufficient to meet my external funding requirements, that the decision to terminate me "still stood". I then asked Dr. Bowser if his decision would change if I obtained another grant before June 30, 2018, and Dr. Bowser responded, "wouldn't matter". Neither Dr. Bowser or Dr.

Lukas provided any detailed information as to how or to what extent I had an external funding shortfall.

27. I obtained from Barrow's accounting department verification that I had sufficient funding to continue my employment and research at Barrow. Between the months of January through March of 2018, I met with my supervisors Drs. Lukas and Bowser in an effort to show them that I had adequate funding to continue my employment beyond June 30, 2018, however neither Dr. Lukas or Dr. Bowser could be swayed to changed their minds.

28. The Barrow Policy provides detailed procedures for individuals holding standing appointments to appeal dismissal of employment decisions or whose positions are being eliminated due to financial emergencies, reorganization, or elimination of programs. (Section 9, pg. 22). In relevant part this section reads:

"**Identification of individuals holding standing appointments who are to be placed on probationary status, who are to be dismissed for cause, or who have positions to be terminated due to financial emergencies, reorganization, or elimination of programs, typically will be the responsibility of the relevant Divisional Chair, but the BNI Director, Vice President of Research (VPR) as appropriate, and/or human resources personnel also may make such an identification. The individual may appeal the proposed placement on probationary status, dismissal, or position termination but will have the burden of proof in any appeal. The affected individual is responsible for submitting an appeal letter to the BNI Director if in a clinical appointment or to the VPR if in a research appointment. The letter shall indicate grounds for the appeal and provide arguments against the proposed personnel action. Appeals pertaining to research faculty will be heard by the Research Faculty Appointments and Promotions Committee (RFAPC), which will make a recommendation about the appeal to the BNI Director, copied to the VPR. In all cases, the**

**BNI Director, upon consultation with the VPR in cases of research faculty, will make a recommendation to the Neuroscience Committee, which will make a final determination either to reject the appeal or to accept it.",** (hereinafter "**Appeal Procedure**").

29.  The Appeal Procedure for individuals with standing appointments makes clear the specific steps that Barrow is required to take when reviewing and deciding upon an appeal.  Relying on this policy, on March 5, 2018, I submitted my written appeal of the decision to terminate my employment, and in it I set forth the reasons why the termination decision should be reversed, namely that I had secured sufficient funding necessary to continue my employment at Barrow.

30.  Barrow did not follow any of the procedures or steps set forth in the Appeal Procedure as it related to my appeal.  For example, the Appeal Procedure required that in all cases, the Barrow Director, upon consultation with the Vice President of Research in cases of research faculty, will make a recommendation to the Neuroscience Committee, which will make a final determination either to reject the appeal or to accept it.

31.  The Barrow Director, Dr. Lawton, never made a recommendation to the Neuroscience Committee regarding my appeal.  Furthermore, the Neuroscience Committee was never convened to hear my appeal.

32.  On May 14, 2018, I received a letter from Barrow's Chief Operating Officer Thomas Bour and from the Director of Human Resources at St. Joseph's Hospital and Medical Center Ms. Melanie Margeson informing me that my appeal had been denied.  Further, this letter informed me that her appeal denial was based on an insufficiency of external funding and claimed that the Research Oversight Committee "*determined that the NSF award would not sustain half of your salary or laboratory expenses, and reaffirmed its decision to discontinue your gap*

*funding. Since you have not identified any other bona fide source of extramural funding, BNI decided that your employment will end on 7/1/2018.*" <u>Exhibit H</u>.

33. The May 14, 2018 letter contradicted the December 18, 2017 email from Dr. Lukas where he both congratulated me on obtaining the NSF Award and confirmed that I had obtained sufficient funding to carry me through the 2018 calendar year. Quoting from his December 18, 2017 email, Dr. Lukas wrote: "With your carry forward and **the remaining gap funding (which we are prepared to provide** because the NSF award does not completely make up for the funds lost in the NIH grant)" you indeed have enough funding to carry you through the 2018 calendar year". Dr. Lukas' December 18, 2017 email failed to mention that the NSF Award was actually for $150,000 annually for a period of three years, commencing in 2018. The May 14, 2018 letter did not detail in any manner how, in light of the $150,000 NSF Award, together with low burn rates identified in Barrow's own Gap Funding Activity account statements (at Exhibits C, D & E), the NSF Award could not sustain half of my salary and benefits and laboratory expenses.

34. At no time was I informed that Barrow's termination decision was based on anything other than an external funding shortfall.

35. Barrow has already commenced steps toward shutting down my laboratory and impairing my resources. For example, they have restricted my ability to use gap funds to order necessary supplies and testing equipment and issued termination notices to my two assistants, effective June 30, 2018

36. Barrow is also in the process of physically preventing me from working in my laboratory and Dr. Bowser said that if I do not vacate by June 30th, he intends to have Barrow dispose of the contents of my laboratory at the end of the June.

37. A closure of my laboratory would cause great harm to my scientific research. Scientific research is time sensitive, and even a temporary halt in operations may cause critical data to become stale, jeopardize important research and discovery. A

closure of my lab as planned by Barrow would significantly impair my ability to secure future funding grants, thus impairing my employability. My projects are in various stages of experimentation, and data would be lost if it was not collected in time, or alternatively, it would have little or no scientific value. My research findings also help in developing treatments of other diseases such as Parkinson's disease, it aids in the development of new rehabilitation strategies for patients with spinal cord injuries, and my discoveries will be utilized in the on going effort to design improved prosthetic devices for individuals who have suffered losses of limbs. My scientific experiments involve working on animals who have to be adequately prepared well in advance of testing, such that a significant delay would cause the experimental findings to be significantly less useful for my research purposes.

38. Further reasons why I would suffer unascertainable damages due to a gap in institutional support as a result of being terminated is because the overwhelming majority of academic positions at teaching and research universities hire on an academic year calendar, meaning that I would more than likely not be employed at another research institute until the Fall of 2019 at the earliest. Without a research institution employing me, I would not be able to carry out my current science program which would in turn impair my ability to secure future funding and employment. Further, my current NSF Award will in all likelihood be revoked once the NSF learns that I am no longer employed at a facility.

39. I depend on my medical benefits and salary from Barrow. Without my salary from Barrow I would not be able to pay my mortgage and risk the loss of my home. Without my medical benefits I would be vulnerable to catastrophically expensive medical costs.

Further, Affiant sayeth naught.

DATED this $\frac{18}{}$ day of June, 2018.

Yamell Ochoa
Notary Public
Maricopa County, Arizona
My Comm. Expires 2-21-2020

Dr. Irina N. Beloozerova

Sworn to and subscribed before me on this $\frac{8}{}$ day of June, 2018.

My commission expires: _____ 2/21/2020