**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irina N Beloozerova,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Dignity Health, d/b/a St. Joseph's Hospital and Medical Center, and d/b/a Barrow Neurological Institute,<br><br>　　　　　Defendant. | No. CV-18-01976-PHX-DGC<br><br>**ORDER** |

Plaintiff Irina Beloozerova filed a complaint in state court against Defendant Dignity Health, doing business at Barrow Neurological Institute ("BNI"), alleging various claims related to Defendant's intention to terminate her employment on July 1, 2018. Doc. 1-1 at 14-32. Defendant removed the action to this Court based on diversity jurisdiction. Doc. 1. At a hearing on June 29, 2018, the Court granted a temporary restraining order ("TRO") that prevented Defendant from taking any adverse employment action against Plaintiff. Doc. 13. On July 24, 2018, the Court held an evidentiary hearing on Plaintiff's motion for a preliminary injunction. Doc. 31. After considering evidence submitted at the hearing and arguments made in writing and at the hearing, the Court will deny the motion and dissolve the TRO.

**I.　Background.**

Plaintiff is a biologist who specializes in brain physiology and has worked as a researcher at BNI since 2000. Doc. 6-1 ¶¶ 3-4. The 1999 letter offering Plaintiff a job at

BNI stated that her employment would be "at will." Ex. 53 at 3. BNI's Appointments and Promotions Policy (the "Policy") states, however, that Plaintiff and others in her position can eventually obtain "standing," and describes procedures BNI must follow to terminate such employees. Ex. 9 at 13-16. Plaintiff and Defendant disagree on whether Plaintiff can be terminated at will or enjoys greater job protections under the Policy.

As a condition of her research position, Plaintiff is required to obtain external funding in the form of grants from governmental or other research-funding organizations to cover half of her salary, half of her fringe benefits, administrative costs,[1] and the full cost of running her laboratory. Court's Livenote Tr. dated July 24, 2018 ("Tr.") at 54-57; Doc. 6-1 ¶ 12; Doc. 12-2 at 2, ¶ 5. Plaintiff obtained such a grant from the National Institutes of Health ("NIH") during some years of her employment, but the NIH funding ended in 2012. Doc. 12-2 at 3, ¶¶ 11-12. Since that time, Plaintiff's salary and research have been covered by "gap funding" provided by BNI and related entities. *Id.* "Gap funding is provided, when available, and when in BNI strategic interests, if an individual who has had sustained, external support should temporarily lose that funding." Ex. 1 at 1. Gap funding "cannot continue indefinitely." *Id.*

As of August 17, 2017, Plaintiff had not secured external funds to replace the NIH grant. Doc. 12-2 at 3, ¶¶ 11-12. BNI therefore gave Plaintiff notice of its intent to terminate her employment:

> In accordance with appointments and promotions and with gap funding policies, and after much deliberation, this letter shall serve as notice that your employment as an Associate Professor in the Division of Neurobiology will end once funds on hand to support your full-time employment have been exhausted (the "Separation Date"), which is projected to be no later than July 1, 2018.

Ex. 1 at 1. Plaintiff initially did not challenge this decision. Indeed, Plaintiff testified at the hearing that Defendant was entitled to terminate her for this reason. *See* Tr. at 58-59.

---

[1] Administrative costs are deemed to be 48.5% of all salaries on Plaintiff's project. *See* Court's Livenote Tr. at 56-57.

- 2 -

But in December 2017, Plaintiff secured a three-year grant from the National Science Foundation ("NSF"). Doc. 6-1 ¶ 19. The NSF grant totaled $450,000, payable at the rate of $150,000 per year. Tr. at 64. Plaintiff immediately informed Defendant of this award in an effort to reverse the termination decision. Doc. 6-1 ¶ 22. Dr. Ronald Lukas, Vice President for Research at BNI, congratulated Plaintiff and suggested that the award appeared to cover Plaintiff's expenses through the end of 2018. Doc. 12-2 at 9. But Dr. Lukas also expressed concern that additional funding would be required to maintain Plaintiff's position. *Id.* After reviewing the NSF grant, BNI's Research Oversight Committee ("ROC") concluded that it was not sufficient to "sustain a competitive research program" and that Plaintiff would be terminated as scheduled on July 1, 2018. Doc. 12-2 at 3, ¶ 16. Plaintiff appealed the ROC's decision in March 2018, but Defendant affirmed the decision on May 14, 2018. Ex. 23. Plaintiff then filed this action alleging breach of contract and other wrongs. Plaintiff obtained the TRO, and seeks a preliminary injunction, on the basis of her breach of contract claim.

## II. Legal Standard.

"A preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Such an injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The movant must "establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

"But if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace,*

*Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (emphasis in original) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)); *see Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018). The Ninth Circuit has explained:

> For the purposes of injunctive relief, "serious questions" refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo. Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation. Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits.

*Rep. of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (1988) (en banc) (internal quotation marks and citations omitted).

**III. Analysis.**

To prevail on her breach of contract claim, Plaintiff must show the existence of a contract, its breach or anticipatory breach, and resulting damages. *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013); *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986).

**A. TRO.**

When it issued the TRO in this case, the Court found that Plaintiff had raised serious questions on her breach of contract claim: whether the Policy altered Plaintiff's at-will employment relationship, whether the Policy limited the circumstances in which Defendant could terminate Plaintiff's employment, whether Plaintiff was on probation when the termination decision was made, and whether the NSF award was sufficient to meet Plaintiff's external funding requirements. Doc. 21 at 31-39. The Court found that the balance of hardships tipped sharply in Plaintiff's favor because termination would interrupt her ongoing research, jeopardize her continued receipt of the NSF award, and injure her professional reputation, while Defendant's hardship would consist only of continuing Plaintiff's employment until the preliminary injunction hearing. *Id.* at 39.

The Court found that Plaintiff's termination likely would cause irreparable harm by damaging her professional reputation, research, and ability to attract external funding (*id.* at 40), and that public policy supported issuance of the TRO given the likelihood of irreparable harm (*id*).

### B. Preliminary Injunction Motion.

Defendant offered no new evidence or argument at the preliminary injunction hearing on two of the Court's TRO findings: that the balance of hardships tips sharply in Plaintiff's favor and that public policy favors an injunction. The Court therefore will not revisit these conclusions.

The parties did offer new evidence and argument on the merits of Plaintiff's breach of contract claim and her assertion of irreparable harm. The Court will first consider whether Plaintiff has established a likelihood of success on the merits or raised serious questions.

#### 1. Existence of a Contract.

Plaintiff contends that the Policy constitutes a contract that imposes restrictions on Defendant's ability to terminate her. Doc. 6 at 5-8. Defendant disagrees, asserting that Plaintiff's employment is at will. Doc. 12 at 5-8. The Arizona Employment Protection Act provides:

> The employment relationship is severable at the pleasure of either the employee or the employer unless both the employee and the employer have signed a written contract[.] . . . Both the employee and the employer must sign this written contract, *or this written contract must be set forth in the employment handbook or manual or any similar document distributed to the employee, if that document expresses the intent that it is a contract of employment*[.]

A.R.S. § 23-1501(A)(2) (emphasis added). The Arizona Supreme Court has explained that terms establishing job security – in a formal contract, an employee handbook, or the conduct of the parties – render the employment relationship "no longer at will." *Demasse v. ITT Corp.*, 984 P.2d 1138, 1143 (Ariz. 1999).

A company policy creates a contract "only if it discloses a promissory intent or [is] one that the employee could reasonably conclude constituted a commitment by the employer." *Id.* (internal quotation marks omitted). A company can overcome an inference of promissory intent by "clearly and conspicuously tell[ing] [its] employees that the [policy] is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason." *Leikvold v. Valley View Cmty. Hosp.*, 688 P.2d 170, 174 (Ariz. 1984), *superseded by statute on other grounds by* A.R.S. § 23-1501; *see also Roberson v. Wal-Mart Stores, Inc.*, 44 P.3d 164, 169 (Ariz. Ct. App. 2002) ("Disclaimers in personnel manuals that clearly and conspicuously tell employees that the manual is not part of the employment contract and that their jobs are terminable at will instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual." (internal quotation marks omitted)); *Ogundele v. Girl Scouts-Ariz. Cactus Pine Council, Inc.*, No. CV-10-1013-PHX-GMS, 2011 WL 1770784, at *5 (D. Ariz. May 10, 2011) (same).

The Court concluded at the TRO hearing, and concludes again, that Plaintiff is likely to prevail on her claim that the Policy amends the at-will employment agreement. The Policy's preface explains that it "describes conditions of and policies concerning academic appointments and promotions of teaching, research and clinical faculty[.]" Ex. 9 at 1. The Policy's purpose "is to establish criteria and means for their enforcement pertaining to initial and continuing appointments." *Id.* at 2. Section 6 "elaborate[s]" on contract letters, setting forth the "types, terms of, and restrictions on appointments." *Id.* at 13. It provides that Defendant will renew annual contracts for professors with standing "except under circumstances as defined below (i.e., until retirement, resignation, reinstatement of probationary status, or dismissal with cause)." *Id.* Section 6 goes on to describe the situations in which an employee with standing can be terminated. *Id.* at 15-16. An employee could reasonably conclude that these portions of the Policy describe contractual terms and limit Defendant's ability to terminate employees with standing. A.R.S. § 23-1501(A)(2); *Demasse*, 984 P.2d at 1143.

Defendant contends that the Policy does not change Plaintiff's at-will status, citing this single sentence: "[I]f human resource policies specifically address issues that this document does not, or if there is a definitive, specific and irreconcilable conflict between policies set forth in this document and human resource policies, the latter shall govern." Ex. 9 at 2-3; *see* Doc. 12 at 7. Defendant then cites separate HR memoranda which state that BNI employment is at-will. Exs. 21, 70, 71. As the Court noted at the TRO hearing, however, this single sentence, with its oblique reference to unidentified HR policies, does not "clearly and conspicuously tell employees that the manual is not part of the employment contract and that their jobs are terminable at will." *Roberson*, 44 P.3d at 169; *see* Doc. 21 at 35-37. The Court again concludes that Plaintiff is likely to prevail on her claim that the Policy altered her at-will employment contract.

### 2. Breach of Contract.

Plaintiff contends that her termination would violate the Policy's restrictions on terminating professors with standing, and the parties devote much evidence and argument to whether Plaintiff was on probation for having secured no external funding for several years and whether Plaintiff had access to gap funding. These issues ultimately are irrelevant, however, because Plaintiff expressly acknowledged during the preliminary injunction hearing that her continued employment is conditioned on her obtaining external funding to cover (1) half of her salary, (2) half of her fringe benefits, (3) administrative costs, and (4) the full cost of running her laboratory. *See* Tr. at 54-58. This acknowledgment comports with Defendant's view of the external funding requirement. *See* Ex. 1 at 1 (August 2017 notice of termination stating "External Funding must cover one-half of the investigator's salary and fringe benefits and the costs for running their research program."); Ex. 23 at 1 (May 2018 letter stating "extramural funding must cover one-half of an investigator's salary and fringe benefits and the costs for running their research program."). Plaintiff also acknowledged at the hearing that Defendant could terminate her if she failed to obtain such external funding. *See* Tr. at 58-59, 102, 117. And she made similar statements in written communications. *See*

Ex. 16 at 1 (Plaintiff stated in March 2018 that Defendant probably had a right to terminate her employment); Ex. 60 at 2 (Plaintiff stated in March 2018 that her continued employment was conditioned upon her acquisition of "adequate external funds to cover half of [her] salary and fringe benefits"); Ex. 77 (Plaintiff admitted in March 2016 that "[w]ithout external funding, [she] will have [her] position at Barrow only till fall 2017").

Given these admissions by Plaintiff, the Court need not determine whether Plaintiff was on probation, nor attempt to delineate the precise terms of the employment contract embodied in the Policy. If Plaintiff did not obtain the required external funding, she agrees that Defendant could terminate her employment. The critical question, therefore, is whether the NSF grant satisfied the external funding requirements. Evidence presented at the preliminary injunction hearing makes it highly unlikely that Plaintiff can prove she obtained the necessary funding.

Plaintiff claims that the NSF grant would cover the four required elements of external funding: (1) half of her salary, (2) half of her fringe benefits, (3) administrative costs, and (4) the full cost of running her laboratory. *See* Tr. at 54-58. But Defendant placed in evidence the actual budget submitted by Plaintiff and approved by the NSF. Ex. 72. The budget allocates only $4,891 to Plaintiff's salary, not the $59,000 required to cover half of her annual compensation. *Id.* at 1. The budget allocates only $6,671 to fringe benefits (*id.* at 1), not the $16,000 Plaintiff testified was required (Tr. at 16). $54,000 of the budget is allocated to pay other professionals, graduate students, and undergraduate students. Ex. 72 at 1. Another $2,000 is assigned to travel, $18,814 to "other direct costs," and $57,124 to indirect costs, which Plaintiff identified as administrative costs. *Id.* Thus, as approved by the NSF, the $150,000 annual grant allocated funds to a variety of destinations and would not meet the obligation to cover all four required categories – (1) half of Plaintiff's salary, (2) half of her fringe benefits, (3) administrative costs, and (4) the full cost of her laboratory. As a result, Plaintiff could be terminated by Defendant without a breach of contract.

Plaintiff claimed at the hearing that the budget approved by the NSF is not binding, and that she has discretion to reallocate the funds as she chooses. She testified that she could reassign the $150,000 to (1) $59,000 for her salary, (2) $16,000 for her fringe benefits, (3) $57,230 for administrative costs, and (4) $17,000 for the costs of running her lab. Tr. at 54-58. For several reasons, the Court does not find this testimony credible.

First, Plaintiff does not dispute that Exhibit 72 represents the budget she submitted to the NSF to obtain the grant funding. Plaintiff initially submitted a larger budget that would have totaled $700,000 over three years, rather than $450,000, but the NSF rejected the larger proposal. Tr. at 63-64. Only when Plaintiff submitted the detailed numbers contained in Exhibit 72 did she receive NSF approval for $450,000. *Id.* at 64-65. This course of events strongly suggests that the NSF approved the specific use of funds set forth in Exhibit 72, not just a lump sum for Plaintiff to use as she wishes.

Second, Sherri Howland, who has been in charge of grant operations at Defendant for 22 years, testified that Plaintiff does have some discretion to redirect funds in an NSF grant, including reallocating up to 25% of the funds and assigning additional money to her compensation, but only if the reallocation does not change the goals and aims of the project. Tr. at 143-44. The Court finds, however, that Plaintiff's proposed reallocation likely would change the goals and aims of her project. When Plaintiff reduced her grant proposal from $700,000 to $450,000, she explained to the NSF that she had decreased the involvement of Dr. Vladimir Marlinski from six to four months and that this change "necessitated reduction of the scope of Aim 1 by limiting it to the investigation of the connection between PPC and PM cortex only." Ex. 72 at 5. Plaintiff's newly proposed reallocation would eliminate Dr. Marlinski's participation altogether. *See* Ex. 86. If a reduction in his participation by one-third would change the scope of the project, so too would a complete elimination of his participation. Further, the proposed changes would eliminate graduate students, decrease the budget for undergraduate students by 60%, eliminate equipment costs, eliminate travel costs, cut material costs by approximately

46%, and reduce publication costs by 50%. *Compare* Ex. 72 at 1 (submitted proposal), *with* Ex. 86 (new proposal). These changes would almost certainly change the goals and aims of the project, something Plaintiff could not do without NSF approval. And Plaintiff testified that she has not sought NSF approval. Tr. at 95-96.

Third, Dr. Lukas testified that the NSF typically does not approve using grant funds for more than two months' salary of the primary investigator. Tr. at 126. Plaintiff's reallocation would cover six months. Ex. 86. Ms. Howland testified that she has never seen the NSF approve such a use of funds. Tr. at 143. Dr. Lukas testified that Plaintiff's proposed reallocation would require NSF approval, something Plaintiff has not sought even though Dr. Lukas told her to seek it. Tr. at 95-96, 126. Plaintiff did not present evidence, other than her own assertion, to rebut Howland and Lukas's characterization of the NSF policy.

Fourth, Plaintiff has not shown that her new budget would cover the full cost of running her laboratory, something she admits is required for her continued employment. After allocating the $150,000 annual grant to her salary, her fringe benefits, and administrative costs, only $17,000 would be left to operate her lab. Tr. at 58. Dr. Lukas testified, however, that Plaintiff's lab costs totaled $92,350 in 2014, $202,485 in 2015, $84,975 in 2016, and $15,853 in 2017. *Id.* at 121-22. Plaintiff attacked Dr. Lukas's personal knowledge of the costs, but did not offer any explanation beyond conclusory allegations as to how $17,000 would be enough to run her laboratory. *See id.* at 58, 84. Nor did Plaintiff address evidence that she already has spent $36,446 for her laboratory in 2018. *Id.* at 124-25. In light of Plaintiff's history of substantial laboratory costs, the Court concludes that she has not shown that her new reallocation would cover the cost of her laboratory.

### 3. Conclusion

In summary, Plaintiff relies entirely on the NSF grant to save her position, but the NSF-approved budget for the grant does not meet the criteria she admits are necessary. And, in light of the evidence described above, the Court finds it highly unlikely that

Plaintiff could simply reallocate the funds as she chooses. Because Plaintiff admits that Defendant may terminate her if she does not secure the required external funding, and she has not shown that she has secured that funding, Plaintiff has not shown that she is likely to succeed on the merits of her claim that her termination would constitute a breach of contract.

The Court granted the TRO on the ground that Plaintiff had raised serious questions, but reaches a different conclusion in light of evidence from the preliminary injunction hearing. As noted above, "[s]erious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Rep. of the Phil.*, 862 F.2d at 1362. Because the Court finds it highly unlikely that Plaintiff can prevail on her claim that the NSF grant satisfies her external funding requirements, the Court concludes that she has not raised serious questions on her breach of contract claim. The Court accordingly will deny Plaintiff's motion for a preliminary injunction.[2]

**IT IS ORDERED** that Plaintiff's motion for a preliminary injunction (Doc. 6) is **denied**. The TRO previously entered by the Court (Doc. 19) is **dissolved**.

Dated this 2nd day of August, 2018.

_____
David G. Campbell
United States District Judge

---

[2] Because Plaintiff has not met her burden on the merits of her breach of contract claim, the Court need not consider the parties' arguments on irreparable harm. Nor will the Court consider Defendant's additional arguments that A.R.S. § 12-1802 bars an injunction and that the alleged contract is too vague for injunctive relief. Doc. 30.